**Affirmed and Memorandum Opinion filed May 16, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00484-CV

---

### CHARTER DRYWALL HOUSTON, INC., Appellant

### V.

### MATTHEWS INVESTMENTS SOUTHWEST, INC. XX, Appellee

---

**On Appeal from the County Civil Court at Law No. 2
Harris County, Texas
Trial Court Cause No. 1156763**

---

## M E M O R A N D U M   O P I N I O N

Appellant Charter Drywall Houston, Inc. appeals the trial court's final judgment in favor of appellee Matthews Investments Southwest, Inc. XX on its fraudulent lien claim. Charter Drywall contends the evidence is legally insufficient to support the trial court's finding that Charter Drywall filed two fraudulent lien affidavits and that the court therefore erred in denying Charter Drywall recovery on its lien foreclosure claim. We affirm the trial court's judgment.

## Background

Matthews Investments, a residential real estate developer, hired Brunson Homes as general contractor to construct two residential homes, which we refer to as "Unit 503A" and "Unit 503B". In late 2017, Brunson Homes requested and received bids from Charter Drywall to install drywall in both units. Brunson Homes did not accept Charter Drywall's proposals.

In January 2018 Charter Drywall delivered and installed drywall without having first agreed on a price with Brunson Homes. Charter Drywall then billed Brunson Homes $8,746 for Unit 503A and $8,746 for Unit 503B. Brunson Homes did not pay the invoices.

In April 2018, Charter Drywall filed mechanic's and materialman's liens against Unit 503A and Unit 503B in the Harris County real property records. Charter Drywall stated in the lien affidavits among other things: (1) that it furnished materials and labor to Brunson Homes pursuant to a written contract dated February 9, 2017; (2) that it provided notice of the asserted lien to Matthews Investments; and (3) that Matthews Investments and Brunson Homes "have a unity of interest within the meaning of Tex. Prop. Code Ann. [section] 53.026."[1]

---

[1] Section 53.026, entitled "Sham Contract," provides that "[a] person who labors or furnishes labor or materials under a direct contractual relationship with a purported original contractor is considered to be an original contractor for purposes of perfecting a mechanic's lien." Tex. Prop. Code § 53.026(a). "Purported original contractor" is defined to mean:

> an original contractor who can effectively control the owner or is effectively controlled by the owner through common ownership of voting stock or ownership interests, interlocking directorships, common management, or otherwise, or who was engaged by the owner for the construction or repair of improvements without a good faith intention of the parties that the purported original contractor was to perform under the contract. For purposes of this subdivision, the term "owner" does not include a person who has or claims a security interest only.

*Id.* § 53.001(7-a). The "sham contracts" statute was designed to deem a subcontractor or materialman as an original contractor when the original contractor acquired such status by virtue

Matthews Investments sold Unit 503B. The title company allegedly did not discover the lien when performing its title investigation. Charter Drywall sent a letter to the buyer, claiming that Charter Drywall owned Unit 503B.

Matthews Investments attempted to sell Unit 503A. Prior to closing, the title company discovered the liens and required Matthews Investments to place $13,500 into escrow. The title company then paid $10,827.82 to Charter Drywall, which released the lien against Unit 503A.

Matthews Investments sued Charter Drywall for filing fraudulent lien affidavits and, alternatively, for unjust enrichment. Charter Drywall filed a counterclaim to foreclose the lien on Unit 503B.

The parties tried the case to the court. In its final judgment, the trial court found that Charter Drywall fraudulently filed the lien affidavits for Unit 503A and Unit 503B. The court also declared the lien affidavit filed against Unit 503B "invalid and of no force or effect." The court ordered Charter Drywall to pay Matthews Investments $20,000 in statutory damages, plus post-judgment interest, court costs, and attorney's fees. Finally, the court ruled that Charter Drywall take nothing on its lien foreclosure counterclaim.

Charter Drywall filed a timely request for findings of fact and conclusions of law. Tex. R. Civ. P. 296. Although the court did not sign and file findings or conclusions by the required deadline, Charter Drywall did not file a notice of past due findings of fact and conclusions of law. *See* Tex. R. Civ. P. 297.

---

of a sham relationship with the owner. *See Trinity Drywall Sys., LLC v. Toka Gen. Contractors, Ltd.*, 416 S.W.3d 201, 209-10 (Tex. App.—El Paso 2013, pet. denied); *see also In re Waterpoint Int'l, LLC*, 330 F.3d 339, 348 (5th Cir. 2003) (noting that the sham contracts provision protects subcontractors and materialmen from situations where the original contractors are no more than an "alter ego" of the owners).

Charter Drywall timely appealed, arguing in a single issue that the trial court erred in holding the lien affidavits to be fraudulent and invalid.

## Standard of Review

Charter Drywall does not specify whether it is raising a legal or factual insufficiency challenge. There is no standard of review included in Charter Drywall's brief, but the summary of the argument includes a statement that "no evidence" supports the trial court's judgment, and the substantive argument throughout the brief indicates that only legal sufficiency is at issue. We limit our review accordingly. *See Benavente v. Granger*, 312 S.W.3d 745, 747 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (when appellant's issue statement challenging the sufficiency of the evidence is ambiguous, court looks to brief's standard-of-review section, argument, and prayer to determine whether appellant challenges legal or factual sufficiency of the evidence).

In an appeal from a judgment rendered after a nonjury trial, we review the trial court's findings using the same standards of review that apply to a jury's verdict. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). To analyze the legal sufficiency of the evidence supporting a finding, we review the record in the light most favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law

or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

As the factfinder in a bench trial, the trial court "weighs the evidence and judges a witness's credibility, and the trial court may accept or reject any witness's testimony in whole or in part." *Brand v. Degrate-Greer*, No. 02-15-00397-CV, 2017 WL 1756542, at *7 (Tex. App.—Fort Worth May 4, 2017, no pet.) (mem. op. on reh'g) (internal quotation omitted). As with any factfinder, the trial court may reject the testimony of an interested witness, even when that testimony is "uncontradicted and unimpeached." *City of Keller*, 168 S.W.3d at 820. The factfinder's credibility determinations must be reasonable, and the factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.*

The failure to file a notice of past-due findings of fact waives the right to complain about the failure to file them, and we therefore review the judgment as though none had been requested. *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 255 (Tex. 1984); *Curtis v. Comm'n for Lawyer Discipline*, 20 S.W.3d 227, 232 (Tex. App.—Houston [14th Dist.] 2000, no pet.). When an appellant does not request or file findings and conclusions, the appellate court presumes the trial court found all fact questions in support of its judgment and must affirm on any legal theory finding support in the pleadings and evidence. *Allen v. Allen*, 717 S.W.2d 311, 313 (Tex. 1986); *Chang v. Nguyen*, 81 S.W.3d 314, 317 (Tex. App.—Houston [14th Dist.] 2001, no pet.). In the absence of findings of fact and conclusions of law, it is implied that the trial court found all

5

facts necessary to support its judgment as long as they also are supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Implied findings may be challenged on appeal for legal sufficiency when the appellate record includes the reporter's and clerk's records. *Id.* We address Charter Drywall's appellate arguments with these principles in mind.

## Analysis

### A.    Fraudulent Liens

Matthews Investments alleged that Charter Drywall violated the fraudulent lien statute, which provides:

> (a) A person may not make, present, or use a document or other record with:
>
>> (1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;
>>
>> (2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and
>>
>> (3) intent to cause another person to suffer:
>>
>>> (A) physical injury;
>>> (B) financial injury; or
>>> (C) mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code § 12.002. Because Charter Drywall filed its lien affidavits pursuant to Chapter 53 of the Texas Property Code, Matthews

6

Investments also was required to show that Charter Drywall acted with an intent to defraud. *See id.* § 12.002(c).

"Fraudulent" is not defined in the statute. When construing a statute, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code § 311.011(a). *Black's Law Dictionary* provides two definitions of a "fraudulent act": "1. Conduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude. 2. Conduct satisfying the elements of a claim for actual or constructive fraud." *Fraudulent Act*, Black's Law Dictionary (11th ed. 2019).

This court and our sister court in Houston have applied a standard consistent with *Black's* first definition—i.e., a lien is fraudulent if created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See Nationstar Mortg. LLC v. Barefoot*, 654 S.W.3d 440, 446-47 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (citing *Young v. Neatherlin*, 102 S.W.3d 415, 421–22 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (even if incorrect, lien was not "fraudulent" when testimony showed filer believed it to be accurate)); *Centurion Planning Corp., Inc. v. Seabrook Venture II*, 176 S.W.3d 498, 507 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (lien "fraudulent" when created by filer "knowing . . . that the lien was invalid and intending that it be given the same legal effect as a valid lien"). Accordingly, when analyzing whether a lien is fraudulent, we will consider whether it was created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See id.*

"Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Therefore, whether a lien filer intended to defraud is ordinarily a

question of fact. *See Hahn v. Love*, 321 S.W.3d 517, 525 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

## B.    The Evidence

Matthews Investments called two witnesses in its case-in-chief—Jack Day, corporate representative for Matthews Investments, and James Brunson, owner of Brunson Homes.[2]  We recount the evidence in the light most favorable to the trial court's implied findings.

It was Brunson Homes' responsibility to hire subcontractors and pay them. Brunson Homes and Charter Drywall had worked together prior to Brunson Homes' work on Unit 503A and Unit 503B.  Charter Drywall worked on four residential construction projects across the street from Unit 503A and Unit 503B, for which Brunson Homes was the general contractor.

It is undisputed that Charter Drywall installed the drywall in Unit 503A and Unit 503B.  There was no written contract, however, and Charter Drywall delivered the drywall to the site and began work without an agreement on a price. At some point either during the drywall installation or after work was finished, a dispute arose between Brunson Homes and Charter Drywall about the price. Brunson recalled that Charter Drywall "talked about" a price after the work was done and that Nicholas Botary, a Charter Drywall employee, "started throwing out a number of 8,700."  Brunson said he did not agree to that price because it "was higher than the ones across the street."  According to Charter Drywall's owner and manager, Robert Randall, the price increase was due to Hurricane Harvey. Brunson and Botary "went through this several times and . . . just never got it resolved with a fair price."  Brunson told Charter Drywall on "several occasions"

---

[2] "Brunson," when used singularly, refers to James Brunson.  "Brunson Homes" refers to the company.

that he disputed the amount to be paid. Brunson said there was still no agreement on price by the time Charter Drywall completed the work.

Day explained that he became aware of a problem with the sheetrock subcontractor when he visited the job site and saw that the sheetrock had been delivered before the insulation was installed. Day asked Brunson about it, who said "that he was in the process of negotiating a price with Charter Drywall." According to Day, Botary told him at some point that "Charter Drywall usually went in and stocked the homes before they were ready so they were guaranteed to get the contracts and if they didn't get the contracts [then] they filed liens on the properties and they have done that on numerous occasions."

Despite the unsettled price, Brunson never told Charter Drywall not to hang the drywall, and Day never sent Charter Drywall notice to vacate the property. Though Charter Drywall finished the drywall installation, Brunson said that the work was not free of defects. Brunson Homes spent $2,000 per unit to fix Charter Drywall's work.

Brunson tried to pay Charter Drywall for its work at a price of $8,000 per unit. Brunson sent Charter Drywall a check, but because it was marked "paid in full" Charter Drywall refused the payment.

Charter Drywall filed a statutory and constitutional lien on both units. To Day's knowledge, Matthews Investments never received notice that the liens had been filed. The payment dispute with Charter Drywall was not resolved before the units were sold. Although the lien affidavits referenced a written contract dated February 9, 2017, it is undisputed no such contract exists and that no written contract was ever signed.

Regarding the relationship between Matthews Investments and Brunson Homes, Day explained that Matthews Investments was not an owner of Brunson Homes and did not invest in or fund Brunson Homes. The two companies did not have any shared executives, directors, or employees. Neither company owned stock in the other or had corporate control over the other. The only relationship between Matthews Investments and Brunson Homes was of owner/contractor.

Randall initially testified that he sent notice of the liens to Brunson Homes and Matthews Investments. However, he later admitted that he only sent notice to Brunson Homes as the "reputed owner." Randall said that the lien affidavit's reference to a February 9, 2017 contract was a "typo" or error. He speculated that his receptionist who typed the lien affidavits "may have made a mistake on that," but that the mistake was not material to "who the owner is, who the original contractor is and the dollar value of [the] work." Regarding the statement in the affidavits that Brunson Homes and Matthews Investments shared a "unity of interest within the meaning of Tex. Prop. Code Ann. [section] 53.026," Randall said he just "honestly kind of assume[d] a builder and a[n] owner have a common interest."

## C.    Application

Charter Drywall argues that there is no evidence that the lien affidavits at issue were fraudulent. It asserts that "fraudulent" means more than "false" in the context of the fraudulent-lien statute. *See Walker & Assocs. Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 849 (Tex. App.—Texarkana 2010, no pet.) ("We see a distinction in an affidavit that is factually inaccurate in some respect and one that is attempting to perpetrate a fraud.").

While conceding that the affidavits contained an error—for example, there was no written contract dated February 9, 2017—Charter Drywall nonetheless

10

contends that the remainder of the affidavits were factually correct and that the reference to a nonexistent contract did not render the liens fraudulent. Charter Drywall denies acting with an intent to defraud. Charter Drywall points to Randall's testimony that he filed the liens solely to protect his rights and had no intention of defrauding Brunson Homes or Matthews Investments.

We agree that "fraudulent" means more than a simple factual inaccuracy for purposes of section 12.002, but the evidence nonetheless supports the trial court's implied findings that not only were the lien affidavits false, but that Charter Drywall filed the liens in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See Barefoot*, 654 S.W.3d at 446.

When, as here, the parties present with two conflicting factual versions of events, the court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). In doing so, it "may consider all the facts and circumstances in connection with the testimony of each witness and accept or reject all or part of that testimony." *Hailey v. Hailey*, 176 S.W.3d 374, 383 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "An appellate court may not substitute its judgment for the trial court's assessment of witnesses' testimony in a bench trial." *Id.*

The court reasonably could have found that neither Brunson Homes nor Matthews Investments entered into a contract with Charter Drywall and that Randall had no reasonable basis to state otherwise in the affidavits. The court could have found that Randall knew the statement was false because Randall testified that Charter Drywall almost exclusively "deal[t] with . . . people on a verbal basis." Moreover, Day testified that Charter Drywall had a pattern and practice of stocking construction projects "before they were ready so [Charter Drywall was] guaranteed to get the contracts" and that "if [Charter Drywall] didn't

11

get the contracts [then it] filed liens on the properties." Also, there was evidence that Matthews Investments and Brunson Homes were not unified in interest, such that those entities had a "sham contract,"[3] and that Charter Drywall had no reasonable basis to state otherwise in the affidavits. This evidence supports a finding that the liens were filed in bad faith, or with dishonesty, or a lack of integrity, and thus were fraudulent. *See Barefoot*, 654 S.W.3d at 453.

Day's testimony that Charter Drywall routinely operated under a scheme to either secure a contract or perform the work and file a lien supports the trial court's finding that Charter Drywall acted with an intent to defraud. *See* Tex. Civ. Prac. & Rem. Code § 12.002(c); *see also Gordon v. W. Houston Trees, Ltd.*, 352 S.W.3d 32, 46 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Intent to defraud is not susceptible to direct proof; therefore, it invariably must be proven by circumstantial evidence.") (internal quotation omitted). Further, the court could have reasonably inferred that Charter Drywall's failure to send notice of the liens to Matthews Investments—and its false statements to the contrary in the affidavits—was an attempt to deliberately conceal the misstatements in the affidavits from the owner. A reasonable factfinder could reject the contrary evidence from Randall, and we must likewise disregard it. *See City of Keller*, 168 S.W.3d at 827.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that there is legally sufficient evidence that Charter Drywall violated section 12.002. *See* Tex. Civ. Prac. & Rem. Code § 12.002(a), (c); *Gray v. Entis Mech. Servs., LLC*, No. 01-11-00129-CV, 2012 WL 1454485, at *5 (Tex. App.— Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.) (holding legally sufficient evidence supported finding that lien affidavit was filed fraudulently).

---

[3] *See supra* note 1.

12

Charter Drywall also challenges the trial court's take nothing judgment on its lien foreclosure claim regarding Unit 503B. Because we affirm the trial court's finding that the lien was fraudulent, there exists no basis to reverse the court's judgment on Charter Drywall's lien foreclosure claim. *See Consol. Reinforcement, L.P. v. Cheraif*, No. 04-18-00443-CV, 2019 WL 2272890, at *4 (Tex. App—San Antonio May 29, 2019, no pet.) (mem. op.).

Because there is legally sufficient evidence to support the trial court's findings that Charter Drywall knowingly presented fraudulent lien affidavits, we overrule Charter Drywall's issue.

## Conclusion

We affirm the trial court's judgment.


/s/     Kevin Jewell
        Justice


Panel consists of Chief Justice Christopher and Justices Jewell and Spain.